Paul H. Zumbro
Lauren A. Moskowitz
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

Attorneys for Joost Johannes Hendrikus De Beijer
as Petitioner and Foreign Representative

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>HEMA UK I Limited,<br><br>                 Debtor in a Foreign Proceeding. | Chapter 15<br><br>Case No. 20-11936 |

**VERIFIED PETITION UNDER CHAPTER 15 FOR RECOGNITION OF A**
**FOREIGN MAIN PROCEEDING AND RELATED RELIEF**

Joost Johannes Hendrikus De Beijer, in his capacity as the duly authorized

foreign representative (the "**Foreign Representative**" or "**Petitioner**") of HEMA UK I

Limited (the "**Debtor**" or "**Scheme Company**"), which is the subject of a proceeding (the

"**English Proceeding**") currently pending before the Business and Property Courts of the

High Court of Justice of England and Wales (the "**High Court**") concerning a scheme of

arrangement (the "**Scheme**") under part 26 of the Companies Act 2006 of the United

Kingdom (as modified, amended or re-enacted from time to time, the "**Companies Act**"),

respectfully submits this verified petition (the "**Verified Petition**" and together with the

Form of Voluntary Petition [Dkt. No. 1], the "**Petition**") seeking entry of an order

(i) recognizing the English Proceeding as a foreign main proceeding pursuant to sections

1515 and 1517 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "**Bankruptcy**

Code"),[1] (ii) granting relief pursuant to section 1520 and (iii) granting further relief pursuant to sections 105(a), 1507(a) and 1521.

In support of the Petition, the Petitioner respectfully submits (a) the *Declaration of Joost Johannes Hendrikus De Beijer as Foreign Representative Pursuant to 28 U.S.C. § 1746 in Support of Verified Petition Under Chapter 15 for Recognition of Foreign Main Proceeding and Related Relief* (the "**Foreign Rep. Decl.**") [Dkt. No. 3], and (b) the *Declaration of Thomas Vickers Pursuant to 28 U.S.C. § 1746 in Support of Verified Petition Under Chapter 15 for Recognition of Foreign Main Proceeding and Related Relief* (the "**UK Law Decl.**") [Dkt. No. 4], each of which has been filed contemporaneously herewith and is incorporated as if fully set forth herein.   In further support of the relief requested, the Foreign Representative respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      The Debtor is a wholly owned subsidiary of HEMA B.V. ("**HEMA**") and part of the HEMA group of companies (the "**Group**"[2]).  Foreign Rep. Decl. ¶ 9.  The parent of the Group is AMEH XXVI B.V. (the "**Parent**"), a company incorporated in the Netherlands.  *Id.*  HEMA is one of the largest and oldest retailers in the Netherlands. **H**ollandsche **E**enheidsprijzen **M**aatschappij **A**msterdam, quickly known as **HEMA**, opened its first department store in 1926. *Id.* ¶ 10.  Located in central Amsterdam, its prices were based on the successful dime store principle; all of the items for sale were priced at

---

[1] Except as otherwise indicated, section and chapter references are to the Bankruptcy Code.

[2] The Group consists of:  HEMA Bondco I (as defined below), HEMA B.V., HEMA Bondco II (as defined below), HEMA UK II Limited, HEMA UK I Limited, HEMA Financial Services B.V., HEMA Bakkerijen B.V., HEMA-Belgie B.V., HEMA Deutschland GmbH, HEMA Duitsland B.V., HEMA Financiering B.V., HEMA Spain S.L., HEMA Far East Ltd., HEMA (Shanghai) Trading Consultancy Co., HEMA France S.A.S., HEMA Austria GmbH, HEMA Retail Limited and HEMA Gmbh & Co KG.

10, 25 or 50 cents.[3]  *Id.*  Today, the Group is a franchise organization that designs, markets, sells and distributes its products through its directly owned stores, a network of branded franchise stores in the Netherlands, e-commerce platforms as well as increasingly through wholesale channels.  *Id.* ¶ 11.  The Group offers an extensive range of products from everyday basic household necessities and a selected food assortment to affordable daily essential items (including cosmetics, stationery, basic ladies and menswear, babywear and towels).  *Id.* ¶ 12.  The Group operates over 775 HEMA stores in 12 countries, with 19,000 employees serving over six million visitors every week.[4]  *Id.* ¶ 10.

2.      Challenging market conditions (which have persisted over the past few years, even preceding the Covid-19 pandemic), accompanied by the cash interest costs required to service the Group's significant funded debt obligations (amounting to approximately €50 million per year) led the Group to consider strategic options beginning in January of 2020 with a view toward decreasing its leverage to a more sustainable level. Foreign Rep. Decl. ¶ 27.

3.      The onset of the Covid-19 pandemic put significant additional pressure on the Group's financial state, as conditions in the retail market have been (and continue to be) exceptionally challenging since March 2020.  Foreign Rep. Decl. ¶ 29.  And while stores gradually have re-opened in the latter half of May 2020, weekly sales continue to perform 14% down year-over-year.  *Id.* ¶ 30.  The Group forecasts that the business will experience an overall decline of 12.6% in net sales in the financial year ending January 2021 compared to the prior financial year ending February 2, 2020.  *Id.* ¶ 32.

---

[3] https://www.hema.com/en-gb/hema-90.

[4] Figures reflect pre-Covid-19 pandemic statistics.

4. The Group's need to deleverage was made more acute in the period leading up to the maturity of the Existing PIK Notes (as defined below) on June 15, 2020, given that the Group had no indication whether the Parent would redeem the Existing PIK Notes. Foreign Rep. Decl. ¶ 28. While the Group is not liable (by way of a guarantee or otherwise) in respect of the Existing PIK Notes, a failure by the Parent to redeem the Existing PIK Notes would have resulted in a cross-default under the Existing RCF (as defined below), which, if the lenders thereunder accelerated their loans, would have led to cross-defaults under the Existing SSNs (as defined below) and the SNs (as defined below). *Id.*

5. The cumulative effect of these conditions, combined with the timing challenge posed by the maturity of the Existing PIK Notes, made it clear that a more comprehensive restructuring of the Group's capital structure would be required to ensure the Group's ability to continue as a going concern. Foreign Rep. Decl. ¶ 34-35. As a result, in April 2020, the Group and certain of its key stakeholders and creditors began to engage proactively with a view to reaching agreement on a consensual transaction that would resolve its short-term liquidity needs, address the impact of the impending Existing PIK Notes maturity and mitigate adverse impacts of the Covid-19 pandemic, while also addressing the Group's long-term broader goal of reducing its leverage to a more sustainable level. *Id.* ¶ 39.

6. On June 15, 2020, the Group announced that the Debtor, the Existing Obligors (as defined below), all of the RCF Lenders (as defined below) and Hedging Providers (as defined below) and approximately 62% (by value) of the Existing SSN Holders (as defined below) had reached an agreement with respect to the high-level terms of the restructuring of the Group's financial arrangements and had executed a Lock-up

Agreement (as defined below), pursuant to which those parties jointly agreed to support the implementation of the restructuring of the Group's existing financing arrangements (the "**Proposed Restructuring**").  Foreign Rep. Decl. ¶ 55.  As of the date of this Petition, approximately 88.56% of Existing SSN Holders by value have acceded to the Lock-up Agreement.  *Id.*

7.     The Scheme, which relates to a series of senior secured notes in the face amount of €600 million (the "**Existing SSNs**"), allows the Debtor to implement the Proposed Restructuring by authorizing the Debtor to act as an attorney to sign a Restructuring Implementation Deed (as defined below) and any relevant restructuring documents on behalf of the ultimate beneficial owners of the Existing SSNs (the "**Scheme Creditors**")[5].  UK Law Decl. ¶ 26.  To effectuate the Scheme, the Debtor applied to the High Court on July 27, 2020 for permission to convene a meeting of its creditors for the purpose of considering and approving the Scheme.  Foreign Rep. Decl. ¶ 68.  The High Court considered that application at a hearing on July 29, 2020 (the "**Convening Hearing**") and issued an order (the "**Convening Order**"), which, among other things, ordered the convening of a meeting (the "**Scheme Meeting**") of the Scheme Creditors on August 19, 2020.  *Id.* ¶ 69.  On August 19, 2020, the Scheme was approved by the requisite majorities of Scheme Creditors voting at the Scheme Meeting (being a majority in number representing 75% in value of the Scheme Creditors).  *Id.* ¶ 71.  Having received the

---

[5] Due to the technical way in which the Existing SSNs are held, the trustee with respect to the Existing SSNs (the "**SSN Trustee**") and the nominee of the common depositary that holds the global notes with respect to the Existing SSNs (the "**Common Depositary Nominee**") are, as a matter of English law, treated as "Scheme Creditors" for purposes of the Scheme.  However, as both the SSN Trustee and the Common Depositary Nominee have undertaken not to vote with respect to the Scheme (in order to avoid double counting), for ease of reference, references to "Scheme Creditors" in this Petition shall refer to the ultimate beneficial owners of the Existing SSNs only.

necessary votes in favor of the Scheme, the High Court will hold a hearing on August 24, 2020, to consider whether to enter an order sanctioning the Scheme (the "**Sanction Order**"). *Id.*, *see also* UK Law Decl. ¶ 18.

8.      The Debtor commenced this chapter 15 case (the "**Chapter 15 Case**") to seek recognition of the English Proceeding as a foreign main proceeding and to obtain related relief.  The Debtor is not seeking any provisional relief under section 1519 of the Bankruptcy Code.  For the reasons set forth below, the Foreign Representative respectfully requests that this Court grant the relief requested herein.

## **BACKGROUND**

### A.      **The Debtor and the Group**

9.      The Debtor is a company incorporated in England and Wales as of July 9, 2020.   Foreign Rep. Decl. ¶ 7.   The Directors of the Debtor comprise the Foreign Representative and Gerardus Matheus Thomas Jegen (the "**Directors**").   Emiel Arjen Schaeffner is the company secretary of the Debtor.  *Id.* ¶ 8.

10.      The Debtor is a wholly owned subsidiary of HEMA and a member of the Group.  The Group consists of the subsidiaries of the Parent (but not the Parent itself, which is not treated as a member of the Group).  Foreign Rep. Decl. ¶ 9.  The Parent is ultimately owned by Ramphastos Participaties Coöperatief II U.A.[6]  *Id.*

11.      The Group opened its first store in Amsterdam in 1926 and within two years had 10 stores throughout the Netherlands.  Foreign Rep. Decl. ¶ 10.  In the 1950s, the Group was the first franchise organization in the Netherlands and is one of the largest franchise operators in the Netherlands.  *Id.*  From 1958, HEMA picked up the pace of its

---

[6] Based on publicly available information.

expansion, rapidly opening new stores across the country.  *Id.*  In 1984, HEMA opened its first store abroad, in Belgium.  *Id.*  Today, there are over 775 HEMA stores (including franchise stores) in 12 countries (including the Netherlands, Belgium, Luxembourg, France, Germany, Spain, the United Kingdom, Austria, Qatar and the United Arab Emirates).  *Id.*  The Group has 19,000 employees serving over six million visitors every week.[7]  *Id.*  The Group has had a number of different owners in its history.  *Id.*  In 2007, it was acquired by Lion Capital, a London-based private equity firm.  In 2018, Lion Capital sold the Group to its current owners, Ramphastos Investments.  *Id.*

12.    The Group designs, markets, sells and distributes its products through its directly owned stores, a network of branded franchise stores in the Netherlands, e-commerce platforms (including mobile and tablet applications), as well as increasingly through wholesale channels.  Foreign Rep. Decl. ¶ 11.  The Group's products feature original and contemporary designs that are substantially all HEMA-branded.  *Id.*

13.    The Group has four product divisions:  (1) apparel; (2) household goods and personal care; (3) food and catering and services; (4) and other; and offers an extensive range of products from everyday basic household necessities and a selected food assortment to affordable daily essential items (including cosmetics, stationery, basic ladies and menswear, babywear and towels).  Foreign Rep. Decl. ¶ 12.

---

[7] *See supra* note 4.

7

B.      **Summary of the Group's Capital Structure**

14.     The Parent holds the entire share capital of three companies incorporated in the Netherlands: (i) HEMA; (ii) HEMA Bondco I B.V. ("**Bondco I**"); and (iii) HEMA Bondco II B.V. ("**Bondco II**"). Foreign Rep. Decl. ¶ 13.

15.     HEMA B.V. is the key holding company of the operating subsidiaries of the Group. Bondco I and Bondco II are special-purpose finance companies that exist solely for the purpose of issuing debt instruments. Foreign Rep. Decl. ¶ 14.

16.     The Group's principal financing arrangements (referred to in this Verified Petition as the "**Existing Principal Financing Arrangements**"), comprise the following: (i) the Existing SSNs, (ii) the Existing Revolving Credit Facility (the "**Existing RCF**"); (iii) the Senior Notes (the "**SNs**"), and (iv) the Hedging Arrangements. Foreign Rep. Decl. ¶ 15.

17.     **The Existing SSNs:**[8]  €600 million senior secured floating rate notes due 2022 originally issued by Bondco I pursuant to a senior secured notes indenture dated as of July 20, 2017, as amended by way of a supplemental senior secured notes indenture dated as of April 20, 2020 and a second supplemental senior secured notes indenture dated as of June 22, 2020, was further amended and converted into an English law trust deed by way of a third supplemental senior secured notes indenture dated as of July 13, 2020 (the senior secured notes indenture as amended and supplemented, the "**Existing SSNs Trust Deed**") between, among others, GLAS Trustees Limited as the SSN Trustee, Global Loan

---

[8] The Petition and its supporting documents (including the Foreign Rep. Decl. and the UK Law Decl.) uses the term "indenture" to refer to the instrument that governed the Existing SSNs *prior* to the change in governing law and jurisdiction (as amended by the third supplemental indenture on July 13, 2020), and the term "Existing SSNs Trust Deed" to refer to the instrument that governs the Existing SSNs *after* the change in governing law and jurisdiction.

Agency Services Limited as the Paying Agent and Calculation Agent, GLAS SAS as Registrar and Transfer Agent and GLAS Trust Corporation Limited as the Security Agent (as defined below).  Foreign Rep. Decl. ¶ 16.

18.     As further explained below, following a consent solicitation process, on July 13, 2020, the governing law of the indenture governing the Existing SSNs (and the guarantees thereunder) was changed from New York law to English law, and the jurisdiction clause of the indenture governing the Existing SSNs (and the guarantees thereunder) was amended to provide jurisdiction in favor of the courts of England and Wales.  Foreign Rep. Decl. ¶ 17.  At the same time, the Debtor also acceded as co-issuer with respect to the Existing SSNs (assuming liability for the rights and obligations of Bondco I in relation to the Existing SSNs on a primary, joint and several basis).  *Id.*  The guarantors in respect of the Existing SSNs are HEMA, Bondco II, HEMA Bakkerijen B.V., HEMA-België B.V., HEMA Duitsland B.V. and HEMA Financial Services B.V. (which together with the Debtor/Scheme Company and Bondco I are the "**Existing Obligors**"). *Id.*

19.     **The Existing RCF**: an €80 million English law-governed super senior secured revolving credit facility.  Foreign Rep. Decl. ¶ 18.  The Existing RCF is currently scheduled to mature in January 2022.  HEMA is the borrower under the Existing RCF and all amounts advanced under the Existing RCF are guaranteed by the other Existing Obligors.  *Id.*  The Scheme does not affect the rights of the lenders under the RCF (the "**RCF Lenders**") under the agreement for the Existing RCF (the "**Existing RCF Agreement**").  *Id.*

20.     **The SNs**: the €150 million senior notes due 2023.  Bondco II is the issuer in respect of the SNs, and all amounts advanced under the SNs are guaranteed by the other Existing Obligors.  Foreign Rep. Decl. ¶ 19.  The SNs are currently scheduled to mature on January 15, 2023.  *Id.*

21.     **The Hedging Arrangements**:  HEMA has entered into a series of secured hedging arrangements, namely:

    i.    derivative and foreign exchange forward transactions with ABN AMRO Bank N.V. pursuant to an ISDA Master Agreement dated July 12, 2019; and

    ii.    foreign exchange forward transactions with ING Bank N.V. (pursuant to an ISDA Master Agreement dated November 26, 2015).  Foreign Rep. Decl. ¶ 20.

ABN AMRO Bank N.V. and ING Bank N.V. (together the "**Hedging Providers**") are also RCF Lenders.  *Id.*

22.     A simplified diagram showing the Group's current structure and financial arrangements is set forth below:



Foreign Rep. Decl. ¶ 21.

23.    The Existing RCF, the Hedging Arrangements and the Existing SSNs are secured by a number of security interests in assets of the Group.  Foreign Rep. Decl. ¶ 22. The security interests include, in particular, share pledges granted by the Parent in respect of its shares in HEMA, Bondco I and Bondco II (the "**Share Pledges**").  *Id.*  The SNs are only secured by a subset of this security package (reflecting the subordinated ranking of the SNs; *see infra* ¶ 24).  *Id.*  All of the Existing Principal Financing Arrangements also benefit from guarantees provided by a number of other Group companies.  *Id.*

24.    The "**Existing Intercreditor Agreement**" is an English law-governed intercreditor agreement dated July 20, 2017 entered into between, among others, the Existing Obligors, GLAS Trust Corporation Limited as security agent (the "**Security Agent**"), the RCF Lenders, the Hedging Providers, the SSN Trustee and the trustee in

respect of the SNs.  Foreign Rep. Decl. ¶ 23.  It governs the relative priority and security enforcement rights in respect of the Existing RCF, the Existing SSNs, the SNs and the Hedging Arrangements.  *Id.*  Under the Existing Intercreditor Agreement, the proceeds of enforcing the security in respect of the Existing Principal Financing Arrangements are to be applied in the following order of priority:  (i) *first*, the Existing RCF and the Hedging Arrangements on a *pro rata* basis and ranking *pari passu* between themselves; (ii) *second*, the Existing SSNs; and (iii) *third*, the SNs.  *Id.*

25.     In addition to the Existing Principal Financing Arrangements, the Parent is the issuer of the €85 million New York law-governed PIK notes due 2020 (the "**Existing PIK Notes**").  Foreign Rep. Decl. ¶ 24.  The Existing PIK Notes are unsecured and do not benefit from any guarantees or other forms of credit support from the Group.  *Id.*  The terms of the Existing PIK Note documents are not governed by, or subject to, the Existing Intercreditor Agreement.  *Id.*  The Existing PIK Notes matured on June 15, 2020, though they have not been redeemed or repaid, and approximately €54 million remains outstanding thereunder.  *Id.*

## C.     Events Leading Up to the Proposed Restructuring

26.     The Group's capital structure, described above, is largely a legacy of the debt incurred in connection with the acquisition of the Group by Lion Capital in 2007. Foreign Rep. Decl. ¶ 25.  Although at the time the debt was originally incurred, the Group's financial performance had been sufficient to sustain this debt burden, in recent years the debt has become increasingly more difficult to carry.  *Id.*  Physical storefronts have seen a decline in traffic, which has negatively impacted the Group's performance.  *Id.*  While the Group has remained profitable at an operational level, like-for-like sales have been down

12

in the last two fiscal years and pro-forma adjusted EBITDA margin decreased from 10% in the financial year ending January 28, 2018 to 8.3% in the financial year ending February 2, 2020 (unaudited).  *Id.*

27.    The following snapshot of the Group's recent financial performance shows that, while net sales have remained relatively stable, the Group's net debt and its leverage ratio have remained relatively high in recent years:

|  | Financial year ending February 2, 2020 (unaudited)[9] | Financial year ending February 3, 2019 | Financial year ending January 28, 2018 |
|---|---|---|---|
| Net sales | €1,259 million | €1,269.7 million | €1,235.5 million |
| Net debt | €698.9 million | €737.6 million | €685.7 million |
| Adjusted EBITDA | €105.5 million | €111.7 million | €123.7 million |
| Leverage ratio (net debt/EBITDA) | 6.54 | 6.60 | 5.54 |

Foreign Rep. Decl. ¶ 26.

28.    The Group's financial difficulties have recently become more acute as a result of two main factors.

29.    *First*, the COVID-19 pandemic has had a severe impact on the Group's operations (in common with many other similar businesses across the world).  Foreign Rep. Decl. ¶ 32.  As a result of the pandemic, it is expected that the Group's adjusted EBITDA for the financial year ending January 31, 2021 will decline by over **56.7%** compared with the previous year.  *Id.*  If there is a "second wave" of COVID-19, it is expected that these forecasts will worsen.  *Id.*  The pandemic has also affected the Group's liquidity position, and the Group expects that it will require a significant injection of new money in the medium term.  *See id*. ¶ 30.

---

[9] Excludes the financial impact of the Covid-19 pandemic, which is explained further below.

30.    *Second*, the looming maturity date of the Existing PIK Notes (June 15, 2020) has had a destabilizing effect on the financial position of the Group for several months.    While the Existing PIK Notes are issued by the Parent alone and are not guaranteed by any members of the Group (or secured by any of the Group's assets), a payment default on the Existing PIK Notes is capable of having a direct impact on the Group.    Foreign Rep. Decl. ¶ 28.    This is because a payment default on the Existing PIK Notes would result in a cross-default under the RCF (absent any agreement with the RCF lenders).    *Id.*    In turn, if the RCF lenders choose to accelerate their loans, this would trigger a cross-default under the Existing SSNs and the SNs.    *Id.*

31.    Shortly after June 15, 2020 (the maturity date of the Existing PIK Notes), holders of the Existing PIK Notes filed a bankruptcy petition with respect to the Parent following the Group's failure to redeem the Existing PIK Notes.    Foreign Rep. Decl. ¶ 31. This added significant adverse media coverage with respect to the Group's financial position in the Dutch press.    *Id.*

32.    As a result of these challenges, it became clear to the Group that absent a comprehensive financial restructuring, it was likely that the Existing Principal Financing Arrangements would have been accelerated and the Security Agent would have been instructed by the Group's creditors to enforce the security by selling the Group's assets and business to the highest bidder, with certain members of the Group entering into insolvency proceedings (a "**Distressed Sale**").    Foreign Rep. Decl. ¶ 35.    The proceeds of any such Distressed Sale would have been distributed to creditors in accordance with the Existing Intercreditor Agreement.    *Id.*

14

33.     The Group appointed PricewaterhouseCoopers ("**PwC**") to provide a financial analysis of the likely returns that creditors would receive in the event of a Distressed Sale.  Foreign Rep. Decl. ¶ 36.  PwC's analysis shows that a Distressed Sale likely would have produced the following returns:

   a.  the RCF lenders and the creditors in respect of the Hedging Liabilities would have been repaid in full;

   b.  the Existing SSNs would have been repaid in part, with a likely return in the range of 36% to 58%; and

   c.  the SNs and the Existing PIK Notes would receive a nil return.  These liabilities are thus said to be "out of the money".  *Id.*

34.     In an effort to avoid a Distressed Sale and to provide a better outcome for its creditors, the Group and certain of its key creditors and stakeholders began to negotiate the terms of the Proposed Restructuring.  Foreign Rep. Decl. ¶ 37.

**D.     Negotiations in Relation to the Proposed Restructuring**

35.     In April 2020, the Group (represented by De Brauw Blackstone Westbroek N.V. (with respect to Dutch law), Cravath, Swaine & Moore LLP (with respect to U.S. law) and Slaughter and May (with respect to English law) as its legal advisors and Goldman Sachs International as its financial advisors) and certain of its key stakeholders and creditors, including an ad hoc group of persons holding a beneficial interest in approximately 65% of the Existing SSNs (the "**Ad Hoc Group**"), began to engage pro-actively with a view to reaching agreement on a consensual transaction that would resolve its short-term liquidity needs, address the impact of the impending Existing PIK Notes maturity and mitigate adverse impacts of the Covid-19 pandemic, while also addressing

the Group's long-term goal of reducing its leverage to a more sustainable level.  Foreign Rep. Decl. ¶ 39.

36.      The participants in these negotiations ultimately reached agreement as to the terms of the Proposed Restructuring.  Foreign Rep. Decl. ¶ 40.  At a high level, the Proposed Restructuring involves a partial debt-for-equity swap whereby the Existing SSNs will be partially discharged and exchanged for new debt and equity instruments.  *See id.* ¶ 45.  All of the creditors and stakeholders ranking below the Existing SSNs (including holders of the SNs and the Existing PIK Notes, as well as the current equity owners of the Group) will receive nothing.  *Id.*  The Existing RCF will remain in place, reflecting its "super senior" ranking.  *Id.*

**E.      Launch of M&A Process**

37.      HEMA has engaged Moelis & Company to run a competitive sales process to identify any third-party interest in acquiring the Group, subject to and following the completion of the Proposed Restructuring.  Foreign Rep. Decl. ¶ 41.

38.      The process formally launched on June 26, 2020, when 57 interested parties were approached.  Process letters were ultimately circulated to 15 potential purchasers. Potential bidders were provided the opportunity to engage with the Group's management in the week commencing June 29, 2020.  Foreign Rep. Decl. ¶ 42.

39.      Final binding bids are expected on September 14, 2020.  In the event that material interest is received, Scheme Creditors will have the opportunity to approve a possible sale of the Group in their capacity as prospective holders of the New Holdco Shares, New Holdco PIK Notes, Amended SSNs and New PPNs (each as defined below). Foreign Rep. Decl. ¶ 43.

### F.    The Proposed Restructuring

40.    Pursuant to the Proposed Restructuring, the entire share capital of Bondco I, Bondco II and HEMA will be transferred by the Security Agent to a new company ("**Newco**").  Foreign Rep. Decl. ¶ 44.  In turn, Newco will be a wholly-owned subsidiary of another new company ("**New Holdco**").  *Id.*  As explained below, the Senior Secured Noteholders will become the shareholders in New Holdco.  *Id.*

41.    A summary of the Proposed Restructuring with respect to the Existing Principal Financing Arrangements and new financing arrangements is set forth below:

| Financing Arrangement | Pre-Restructuring | Post-Restructuring[10] |
|---|---|---|
| 1.  **Existing SSNs** | • €600 million senior secured floating rate notes due 2022 | • 50% (€300 million) remain in place on amended terms (the "**Amended SSNs**")<br>• 50% (€300 million) discharged in exchange for: (1) €120 million of new "payment-in-kind" notes issued by New Holdco (the "**New PIK Notes**") (see below); and (2) 3 million shares (with an aggregate nominal amount of €30,000) in New Holdco (the "**New Holdco Shares**") (whereby the Existing SSN Holders will become the sole shareholders of New Holdco). |
| 2.  **The Existing RCF** | • €80 million super senior secured revolving credit facility scheduled to mature in January 2022 | • Total commitment remains the same (€80 million) but amended on new terms, including an extended maturity date of September 2024. |
| 3.  **SNs** | • €150 million senior notes due in January 2023 | • Transferred to Newco in consideration for €1 (reflecting the nominal value of the SNs given that the Group's value breaks in the Existing SSNs, which is expected to be supported by the Fairness Opinion (as defined below)), and converted into equity in Bondco II. |
| 4.  **Existing PIK Notes** | • €85 million New York law-governed PIK notes due 2020 issued by the Parent | • Remain outstanding against the Parent (which no longer will be a shareholder of the Group) with no recourse against the Group. |

---

[10] Further information with respect to the New Holdco PIK Notes, the New Holdco Shares, the Amended SSNs, the New PPNs, the Amended RCF Commitments, the SNs and the Existing PIK Notes can be found in the Explanatory Statement (see Part C, ¶¶ 4.32–4.39).

| Financing Arrangement | Pre-Restructuring | Post-Restructuring[10] |
|---|---|---|
| 5. New PPNs | • N/A | • Existing SSNs Holders will also have an opportunity to lend new money to the Group by subscribing for new private placement notes issued by HEMA with a face value of €42 million (the "**New PPNs**"). <br> • Designed to ensure that the Group has sufficient liquidity to address its cash flow requirements over the medium term. The Existing SSN Holders will be entitled (but not obliged) to subscribe for the New PPNs *pro rata* to their Existing SSN holdings. <br> • In order to create an incentive for the Existing SSN Holders to lend the new money that the Group needs, any Existing SSN Holder who elects to subscribe for New PPNs will receive an enlarged proportion of the Amended SSNs. <br> • Further, in order to ensure that the full amount of New PPNs are subscribed for, certain members of the Ad Hoc Group have agreed to backstop the issuance of the New PPNs on a several, not joint, basis in exchange for a cash fee equal to 5% of its total backstop commitment. |
| 6. New PIK Notes | • N/A | • Issued by New Holdco with a face value of €120 million scheduled to mature within five and a half years from the effective date of the Proposed Restructuring. |

Foreign Rep. Decl. ¶ 45.

42.     The detailed terms of the Proposed Restructuring are set out in the restructuring implementation deed to be entered into between, among others, the Scheme Company, the Scheme Creditors, Newco, New Holdco and the RCF Lenders (the "**Restructuring Implementation Deed**").

43.     The Security Agent will also be a party to the Restructuring Implementation Deed and will play an important role in the transaction as a whole. Foreign Rep. Decl. ¶ 48. For example, the Security Agent will enforce the Share Pledges and thereby transfer the entire share capital of Bondco I, Bondco II and HEMA to Newco. *Id.* This will require the Security Agent to petition a competent court in Amsterdam (the "**Dutch Court**") to approve the proposed enforcement of the Share Pledges (the "**Dutch Court Approval**"), a process that is expected to take several weeks. *Id.*

44.     There are additional steps that are required to implement the Proposed
Restructuring in accordance with the provisions of the Existing Intercreditor Agreement.
Foreign Rep. Decl. ¶ 50.  In short, these provisions provide for the release or transfer of
the existing security package and the claims of the Group's lenders, including the holders
of SNs (the "**SN Holders**"), against the Group in the context of a "Distressed Disposal"
under the relevant provisions of the Existing Intercreditor Agreement.  *Id.*  In order to be
able to effect a release of the claims of the SN Holders, the Existing Intercreditor
Agreement imposes certain additional requirements on the transactions:

> a.  the proceeds of the sale must be in cash or cash and/or other marketable
> securities or, if they are not, the Security Agent must procure an opinion
> from an investment bank, firm of accountants or similar entity that the
> amount received in connection therewith is fair from a financial point
> of view taking into account all relevant circumstances including the
> method of enforcement (a "**Fairness Opinion**");
>
> b.  all guarantee claims and security interests of the RCF Lenders and the
> Existing SSN Holders in respect of the entity being sold must be
> released and discharged (and not assumed by the purchaser or one of its
> affiliates) simultaneously and concurrently with such sale;
>
> c.  however, in the event of a "sale" of such claims (instead of a release and
> discharge), and in circumstances where the Existing SSN Holders are
> the "Instructing Group" for these purposes (as they would be in this
> case), the agent in respect of the Existing RCF Agreement and the SSN
> Trustee may determine (acting reasonably and in good faith) that the
> RCF Lenders and the Existing SSN Holders will recover more by a sale
> of their claims than a release or discharge of those claims (although still
> less than the total amount of those claims).   The Security Agent is
> entitled to transfer such claims to the purchaser, with the consideration
> for such sale capable of being a credit bid of all or part of the "Senior
> Secured Liabilities" (being the liabilities under the Existing RCF and
> the Existing SSNs).  *Id.*

45.     While the Proposed Restructuring does not technically involve a release of
the claims of the SN Holders (instead such claims will be transferred to Newco together
with the claims of the SSN Holders and the RCF Lenders), and it may be argued that such

additional requirements do not apply, the Debtor has formulated steps that are designed to bring the Proposed Restructuring in compliance with the provisions in clause 14.2(g) of the Existing Intercreditor Agreement in the event that they do or are deemed to apply. Foreign Rep. Decl. ¶ 51.  A detailed overview of these steps are outlined in the Explanatory Statement (Part A, ¶¶ 4.3-4.31).

46.     A diagram showing the anticipated make-up of the Group's capital structure following the completion of the Proposed Restructuring is set forth below:



Foreign Rep. Decl. ¶ 52.

47.    The Directors believe that the benefits of the Proposed Restructuring for the

Scheme Creditors are as follows:

    a.    the preservation of approximately €427 million (including the anticipated Lock-up Fee (as defined below)) worth of the Existing SSN Holders' debt claims through the Amended SSNs and the issue of the New Holdco PIK Notes;

    b.    the opportunity for Scheme Creditors to participate in the Group's future success and capital growth through the issue of 100% of New Holdco Shares to the Existing SSN Holders; and

    c.    the opportunity to subscribe for the New PPNs.  Foreign Rep. Decl. ¶ 53.

48.    The Directors believe that the benefits of the Proposed Restructuring for

the Group are as follows:

    a.    the Group's debt will be reduced from €830 million to approximately €427 million (including the anticipated Lock-up Fee) through the reduction of the principal amount of the SNs to zero and the partial reduction of the principal amount of the Existing SSNs;

    b.    the Group's cash interest payments will decrease from approximately €50 million to approximately €30 million per year;

    c.    the Group will be granted an injection of additional liquidity through the issue of the New PPNs;

    d.    the Group's net leverage will be reduced to approximately 3.60x EBITDA (from 6.60x 2019 EBITDA); and

    e.    the strengthened financial position of the Group will enable management to focus its attention on ensuring the continued positive performance of the Group.  Foreign Rep. Decl. ¶ 54.

**G.    The Scheme**

*Overview of the Scheme*

49.    A scheme of arrangement is a proceeding under the laws of England and

Wales that allows companies to effect compromises or arrangements, including

restructuring their liabilities, with their members and/or creditors, or any class of them.  *See*

21

UK Law Decl. ¶ 11.  Here, the Scheme will facilitate a restructuring of the Existing SSNs whereby the Existing SSNs will be partially discharged and exchanged for new debt and equity instruments.  *See* UK Law Decl. ¶ 25.

50.     The Scheme plays an integral part in the Proposed Restructuring as it will authorize the Scheme Company (on behalf of the Scheme Creditors) to enter into the Restructuring Implementation Deed, which will implement the terms of the Proposed Restructuring.  *See* UK Law Decl. ¶ 26.

51.     The Scheme relates solely to the Existing SSNs.   UK Law Decl. ¶ 25. Amendments to the Existing RCF, the SNs and the Hedging Arrangements contemplated under the Proposed Restructuring will be effectuated outside of the Scheme.  *Id.*

### Support for the Scheme

52.     On June 15, 2020, the Group announced that a large number of the Group's creditors in respect of the Existing Principal Financing Arrangements, including all of the RCF Lenders and approximately 62% by value of the Existing SSN Holders (the "**Participating SSN Holders**") had signed a lock-up agreement (the "**Lock-up Agreement**") pursuant to which those parties jointly agreed to support the implementation of the Proposed Restructuring (and, in the case of the RCF lenders, a temporary waiver of the cross-default that arose from the payment default on the Existing PIK Notes when they were not repaid at maturity on June 15, 2020).  Foreign Rep. Decl. ¶ 55.  A number of other Existing SSN Holders have subsequently acceded to the Lock-up Agreement and as of the

date of this Petition, 88.56% of the Existing SSN Holders have acceded to the Lock-up

Agreement. *Id.*

53.     Pursuant to the Lock-up Agreement, among other things, the RCF Lenders

and the Participating SSN Holders:

a.   undertook to take all actions reasonably required to be taken in order to support, facilitate, implement, consummate or otherwise give effect to the Proposed Restructuring in accordance with the term sheet and steps plan appended to the Lock-up Agreement (which, in the case of the Participating SSN Holders, includes voting in favor of the Scheme);

b.   waived defaults or events of default existing or foreseen under any of the applicable Existing Principal Financing Arrangements at the time the Lock-up Agreement was entered into or that would be triggered as a result of any action required in order to implement the Proposed Restructuring;

c.   agreed to certain transaction milestones, which include:

i.     issuing the PSL (as defined below) by July 15, 2020;

ii.    holding a meeting of the Scheme Creditors by August 12, 2020[11]; and

iii.   the Scheme being sanctioned by August 17, 2020.[12]

d.   undertook not to take any enforcement action under any of the applicable Existing Principal Financing Arrangements (other than as permitted under the Lock-up Agreement);

e.   agreed not to transfer their rights, obligations and/or debt under the Existing RCF and/or the Existing SSNs (as applicable) unless the transferee is also a party to the Lock-up Agreement or accedes to the Lock-up Agreement as part of the transfer (subject to a limited exception

---

[11] Although the Scheme Meeting will now take place on August 19, 2020, this is within the five-business-day grace period provided for in the Lock-up Agreement.

[12] While, on the current timing, the Scheme will not be sanctioned until August 24, 2020, the relevant provisions of the Lock-up Agreement provide for a five-business-day grace period and a further five-business-day notice period before the Lock-up Agreement can be terminated by the requisite majorities of RCF Lenders and Participating SSN Holders. In any event, the Group remains confident that the relevant majorities of Participating SSN Holders and Existing RCF Lenders will accommodate this timing issue, if required.

in relation to the settlement of credit default swaps in respect of the Existing SSNs); and

    f.  are entitled to receive a fee for their entry into the Lock-up Agreement (the "**Lock-up Fee**"), which will be payable on the date on which the Proposed Restructuring becomes effective pursuant to the terms set out in the Restructuring Implementation Deed (the "**Restructuring Effective Date**"). Foreign Rep. Decl. ¶ 56.

54.    On June 24, 2020, in order to facilitate the Proposed Restructuring and to enable the Existing SSNs to be compromised by way of a scheme, a consent solicitation process was launched to amend the terms of the Existing SSNs as follows:

    a.  permit the accession of the Scheme Company as co-issuer of the Existing SSNs under the Existing SSNs Trust Deed;

    b.  change the governing law of the indenture governing the Existing SSNs (and the guarantees thereunder) from New York law to the laws of England and Wales; and

    c.  change the jurisdiction clause of the indenture governing the Existing SSNs (and the guarantees thereunder) such that the courts of England and Wales have (i) non-exclusive jurisdiction to settle any disputes or proceedings that arise out of or in connection with the Existing SSNs Trust Deed and (ii) exclusive jurisdiction to settle any such disputes or proceedings instituted by Bondco I, the Debtor or any of the Existing Obligors in relation to any Existing SSN Holders or the SSN Trustee on behalf of the Existing SSN Holders. Foreign Rep. Decl. ¶ 61.

55.    The consent solicitation was duly approved on July 10, 2020 by **91.097%** (by value) of the Existing SSN Holders. On July 13, 2020, the amendments were brought into effect by way of a supplemental indenture characterized and executed as a supplemental trust deed. Foreign Rep. Decl. ¶ 62.

**H.    Implementation and Benefits of the Proposed Restructuring**

    *Implementation of the Proposed Restructuring*

56.    In order to implement the Proposed Restructuring, certain actions and approvals by the Scheme Creditors, the RCF Lenders and the Hedging Providers are

required.    Each of these actions and approvals is summarized below.    Foreign Rep.

Decl. ¶ 63.

57.    **The Scheme**: if approved, the Scheme will authorize the Scheme Company

to sign the Restructuring Implementation Deed and any relevant documents related to the

Proposed Restructuring (the "**Restructuring Documents**"[13]) on behalf of the Scheme

Creditors (and their permitted transferees and assignees), which will facilitate the

completion of the other steps required in order to implement the Proposed Restructuring.

Foreign Rep. Decl. ¶ 64.

    a.  The Restructuring Implementation Deed will, among other things:

        i.  set out the steps required to implement the Proposed Restructuring;

        ii.  set out the conditions precedent to the completion of the Proposed Restructuring;

        iii.  contain certain customary representations and warranties; and

        iv.  contain certain customary releases, as described in paragraph (b). *Id.*

    b.  The Restructuring Implementation Deed, as facilitated by the Scheme, will also authorize the release of third-party claims against all obligors and guarantors in respect of the Existing SSNs, including the Debtor, the other co-issuer (Bondco I) and all other guarantors within the Group (the "**Releases**"). *Id.*

58.    **The RCF Lenders and the Hedging Providers**:  each of the RCF Lenders

and the Hedging Providers will enter into the Restructuring Implementation Deed and any

relevant Restructuring Documents, which will facilitate the implementation of the

Proposed Restructuring.  Foreign Rep. Decl. ¶ 65.

---

[13] A detailed summary of the underlying Restructuring Documents can be found in the Explanatory Statement (Part B).

59.   **Dutch Court Approval**:[14]  following the sanctioning of the Scheme and the enforcement of the Share Pledges, the Security Agent will then petition the Dutch Court to approve the enforcement of the Share Pledges and the transfer of the Group to Newco. Foreign Rep. Decl. ¶ 66.  The hearing of the Dutch Court with respect to the Dutch Court Approval (the "**Dutch Court Hearing**") is expected to take place shortly after the date and time at which a certified copy of the Sanction Order is delivered to the Registrar of Companies for registration.  *Id.*  The Scheme Company will notify the Scheme Creditors of the anticipated date of the Dutch Court Hearing and the obtaining of the Dutch Court Approval once these are known.  *Id.*  Following the granting of the Dutch Court Approval, the share purchase agreement (which provides for the Security Agent (as seller) to transfer the shares currently held by the Parent in HEMA, Bondco I and Bondco II to Newco (as buyer)) will become effective and the remaining Restructuring Steps will take effect in accordance with the Restructuring Implementation Deed.  *Id.*

I.   **Commencement of the English Proceeding and Activity to Date**

60.   On July 15, 2020, GLAS Specialist Services Limited (the "**Information Agent**") sent the practice statement letter (the "**PSL**") to the Scheme Creditors via email (to those Scheme Creditors of whose details the Information Agent was aware as a result of the entry into the Lock-up Agreement) and posted publicly on the Group's website, without the need for Scheme Creditors to make any confirmations or sign a non-disclosure agreement.  Foreign Rep. Decl. ¶ 67.  On July 16, 2020, the PSL was also made available through document management clearing systems maintained by Clearstream Banking S.A.

---

[14] The Dutch Court Process is a step of the Proposed Restructuring that will be effectuated outside of the Scheme.  Thus, the Foreign Representative and the Debtor are not seeking any recognition of the Dutch Court Process as part of this Chapter 15 Case.

and Euroclear Bank S.A./N.V. (the "**Clearing Systems**"). *Id.* The PSL included the expected date and format (*i.e.*, virtual) of the Convening Hearing and further indicated that as soon as the details have been confirmed by the Court, the precise date, time and location would be made available at https://glas.agency/2020/07/15/hema-b-v-scheme-documents/ (the "**Scheme Website**"). *Id.* On July 27, 2020, the Debtor filed an application under part 26 of the Companies Act, thereby commencing the English Proceeding and requesting that the High Court approve the Debtor's request to convene the Scheme Meeting of the Scheme Creditors. *Id.* ¶ 68.

61.     On July 29, 2020, the High Court held the Convening Hearing. Following the Convening Hearing, on July 29, 2020, the High Court entered the Convening Order authorizing the Debtor to convene the Scheme Meeting on August 19, 2020. Foreign Rep. Decl. ¶ 69.

62.     On July 29, 2020, following the Convening Hearing, the Information Agent published the Scheme and related documents, including the Explanatory Statement, on the Scheme Website and notified Scheme Creditors via email and the Clearing Systems that these documents were available there. Foreign Rep. Decl. ¶ 70.

63.     In accordance with the Convening Order, the Debtor convened the Scheme Meeting on August 19, 2020, at 11:00 a.m. (British Summer Time). Foreign Rep. Decl. ¶ 71. The Scheme was unanimously approved by the Scheme Creditors that voted at the Scheme Meeting. Those voting Scheme Creditors represented 98.07% in value of the Existing SSNs. *Id.* Accordingly, the Debtor satisfied the requirement under English law that a majority in number representing at least 75% in value of the claims held by creditors who are present and voting at the Scheme Meeting approve the Scheme. *See* UK Law.

Decl. ¶ 18.   Having received the necessary votes in favor of the Scheme from the Scheme

Creditors, the High Court will conduct the Sanction Hearing which is currently scheduled

for August 24, 2020.  Foreign Rep. Decl. ¶ 71.

64.     The Debtor respectfully requests that the relief requested herein be granted

by the Court shortly after the Sanction Hearing.  *See Ex Parte Application Pursuant to*

*Federal Rules of Bankruptcy Procedure 2002, 9006 and 9007 for Order Scheduling*

*Hearing and Specifying Form and Manner of Service of Notice* [Dkt. No. [●]].

## JURISDICTION AND VENUE

65.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157(a) and 1334  and the Amended Standing Order of Reference to Bankruptcy Judges

of the District Court for the Southern District of New York, dated January 31, 2012,

Reference M-431, *In re Standing Order of Reference Re: Title 11*, 12 Misc. 0032 (S.D.N.Y.

Feb. 1, 2012) (Preska, C.J.).

66.     This case has been properly commenced pursuant to section 1504 of the

Bankruptcy Code by the filing of this Petition for recognition of the English Proceeding

pursuant to section 1515 of the Bankruptcy Code.  These are core proceedings pursuant to

28 U.S.C. § 157(b)(2)(P), and the Court may enter a final order in respect of them under

Article III of the United States Constitution.

67.     Venue is proper in this district.   A chapter 15 case "may be commenced in

the district court of the United States for the district . . . in which the debtor has its principal

place of business or principal assets in the United States" and if the debtor does not have a

place of business or assets in the United States, a chapter 15 case may be commenced in

the district where "there is pending against the debtor an action or proceeding in a Federal or State Court". 28 U.S.C. § 1410.

68.     The Debtor's only material asset in the United States—a retainer deposited with counsel to the Foreign Representative that is being held in a New York bank account for the benefit of the Debtor—is located in this District. The Debtor has no place of business or litigation pending against it in the United States.

## RELIEF REQUESTED

69.     By this motion, the Petitioner respectfully requests the entry of the Proposed Order, in the form attached hereto as **Exhibit A** (the "**Proposed Order**"), that grants the following relief (the "**Relief Requested**"):

    a.   finds that the Debtor is eligible to be a chapter 15 debtor;

    b.   recognizes the English Proceeding as a foreign main proceeding within the meaning of section 1502 of the Bankruptcy Code;

    c.   recognizes the Petitioner as the "foreign representative" in respect of the English Proceeding;

    d.   finds that the Petition was properly filed and meets the requirements of section 1515 of the Bankruptcy Code;

    e.   grants recognition of the English Proceeding as a "foreign main proceeding" under sections 1517 and 1520;

    f.   grants all relief afforded to foreign main proceedings under section 1520 of the Bankruptcy Code;

    g.   grants any additional relief that is necessary to grant comity to and give full force and effect within the territorial jurisdiction of the United States to the English Proceeding (including all of the legal and factual findings of the High Court related to the Scheme) and the Scheme (including the Releases), including a permanent injunction against any entity or person (as defined in sections 101(15) and 101(41) of the Bankruptcy Code) from commencing any action or taking any action that is in contravention of or inconsistent with the Scheme (the "**Injunction**"), and any other additional relief that may be just and proper, pursuant to

this Court's discretionary powers under section 1507 and 1521 of the Bankruptcy Code;

h. provides that no action taken by the Petitioner in preparing, disseminating, applying for, implementing or otherwise in connection with the Scheme, the Restructuring Documents, any order entered in respect of this Petition, the Chapter 15 Case, any further order for additional relief in the Chapter 15 Case, or any adversary proceedings or contested matters in connection therewith, will be deemed to constitute a waiver of any immunity afforded the Petitioner as Foreign Representative, including, without limitation, pursuant to section 1510 of the Bankruptcy Code;

i. waives any applicable 14-day stay of effectiveness of the order once granted;

j. provides that this Court shall retain jurisdiction with respect to the effect, enforcement, amendment or modification of the order; and

k. finds that granting the relief in sub-paragraphs (a) through (j) is not manifestly contrary to the public policy of the United States.

## **BASIS FOR RELIEF**

### I.     THE DEBTOR IS ELIGIBLE TO BE A CHAPTER 15 DEBTOR.

70.     Section 109(a) of the Bankruptcy Code provides that "only a person that resides or has a domicile, a place of business, or property in the United States . . . may be a debtor under this title". 11 U.S.C. § 109. In this Circuit, section 109(a) applies to debtors seeking relief under chapter 15 of the Bankruptcy Code. *See In re Barnet*, 737 F.3d 238, 247 (2d Cir. 2013) ("The debtor that is the subject of the foreign proceeding . . . must meet the requirements of Section 109(a)").

71.     Section 109(a) of the Bankruptcy Codes neither requires a specific quantum of property in the United States nor states when or for how long that property must be located within the United States. *See, e.g., In re Octaviar Admin. Pty Ltd*, 511 B.R. 361, 373 (Bankr. S.D.N.Y. 2014) ("Section 109(a) says . . . nothing about the amount of [the]

30

property nor does it direct that there be any inquiry into the circumstances surrounding the debtor's acquisition of the property"); *In re Berau Capital Res. Pte. Ltd.*, 540 B.R. 80, 82 (Bankr. S.D.N.Y. 2015) ("Section 109(a) of the Bankruptcy Code does not specify how much property must be present or when or for how long property has had a situs in New York.").

72.     The Debtor here qualifies as a debtor under section 109(a) because it has property in the United States.  The Debtor has an interest in funds deposited with Cravath, Swaine & Moore, LLP, U.S. counsel to the Debtor in connection with this chapter 15 proceeding, which funds are held in an account with JPMorgan Chase Bank in New York, New York (the "**Retainer Account**").  Foreign Rep. Decl. ¶ 74.

73.     Courts in this District have held that funds in a retainer account in the possession of counsel to a foreign representative constitute property of the debtor in satisfaction of section 109(a)'s eligibility requirements.  *See, e.g.*, *In re Octaviar*, at 372-374; *In re Polymanov,* 571 B.R. 24, 30 (Bankr. S.D.N.Y. 2017); *In re PT Bakrie Telecom Tbk*, 601 B.R. 707, 714-715 (Bankr. S.D.N.Y. 2019) ("Examples of property sufficient to satisfy the requirement [of section 109(a)] include funds held in a retainer account in the possession of the foreign representative's counsel").  Accordingly, the Debtor is eligible to be a chapter 15 debtor.

## II.     THE DEBTOR SATISFIES THE REQUIREMENTS FOR CHAPTER 15 RECOGNITION UNDER 11 U.S.C. § 1517.

74.     Section 1517(a) of the Bankruptcy Code provides that, after notice and a hearing, "an order recognizing a foreign proceeding shall be entered if—

(1) "such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502";

(2) "the foreign representative applying for recognition is a person or body"; and

(3) "the petition meets the requirements of section 1515."

**A.      The English Proceeding Is a Foreign Main Proceeding.**

> *1.      <u>The English Proceeding Is a "Foreign Proceeding".</u>*

75.      The English Proceeding is a "foreign proceeding" for purposes of section 1517(a).  The Bankruptcy Code defines a "foreign proceeding" as:

> "[A] a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation."  11 U.S.C. § 101(23).

76.      Based on this definition, courts applying section 101(23) look for:

> i.    "[the existence of] a proceeding";
>
> ii.   "that is either judicial or administrative";
>
> iii.  "that is collective in nature";
>
> iv.   "that is in a foreign country";
>
> v.    "that is authorized or conducted under a law related to insolvency or the adjustment of debts";
>
> vi.   "in which the debtor's assets and affairs are subject to the control or supervision of a foreign court"; and
>
> vii.  "which proceeding is for the purpose of reorganization or liquidation."

*In re ENNIA Caribe Holding N.V.*, 594 B.R. 631, 638 (Bankr. S.D.N.Y. 2018); *see also In re Ashapura Minechem Ltd.*, 480 B.R. 129, 136 (S.D.N.Y. 2012).

77.      Here, the English Proceeding is a proceeding commenced pursuant to part 26 of the Companies Act, a part of an English law that governs corporate arrangements

32

and reconstructions and is frequently (though not exclusively) used in a restructuring context.  UK Law Decl. ¶ 11.  For purposes of chapter 15 recognition, courts have held that the essence of a "proceeding" is when "acts and formalities [are] set down in law so that courts, merchants and creditors can know them in advance, and apply them evenly in practice."  *In re Betcorp Ltd.*, 400 B.R. 266, 278 (Bankr. D. Nev. 2009).  Because the English Proceeding operates under such a statutory framework, the first factor of section 101(23) is satisfied.

78.     The English Proceeding is "judicial" because it has been commenced before the High Court, and is thereafter subject to the supervision of the High Court, which is a judicial body of the United Kingdom.  Furthermore, the Scheme must be approved by the High Court for it to be effective.  *See* Explanatory Statement (Part C, at 96) ("Effectiveness of the Scheme requires the sanction of the [English] Court"); *see also In re Avanti Commc'ns Grp. PLC*, 582 B.R. 603, 614 (finding that a foreign proceeding was judicial because "it required the Convening Order to convene the Debtor's Scheme Meeting and required the Sanction Order for the Scheme to be sanctioned, each issued by the UK Court.").

79.     The English Proceeding is "collective" because it involves all Scheme Creditors and requires a majority in number of the voting Scheme Creditors representing 75% in value of each class of Scheme Creditors, present and voting either in person or by proxy at a meeting ordered to be summoned by the High Court, to vote in favor of the Scheme in order for the Proposed Restructuring to proceed.  *See* UK Law Decl. ¶ 18.

80.     The English Proceeding is pending in London, England, which is a foreign country.

81.     The scheme of arrangement under the Companies Act is a flexible tool that is commonly used to restructure all or part of a company's debt.  UK Law Decl. ¶ 11. Accordingly, the Scheme and the related English Proceeding are authorized or conducted under a law related to insolvency and/or the adjustment of debts.

82.     The English Proceeding subjects the Debtor to supervision of a foreign court.  The English Proceeding has been commenced before the High Court.  Foreign Rep. Decl. ¶ 68.  The alteration of the Debtor's assets and liabilities is subject to the High Court approving the Scheme and entering the Sanction Order.  Thus, the High Court has control over the Debtor's assets and affairs through the English Proceeding.

83.     The Scheme has been proposed by the Debtor for the purpose of implementing the Proposed Restructuring.  *See* Explanatory Statement (Part E, ¶ 5.1) ("The Scheme will authorize the Scheme Company . . . to enter into the Restructuring Implementation Deed . . . , which will implement the terms of the Proposed Restructuring").

84.     Furthermore, courts in this District routinely recognize schemes of arrangement under UK law as foreign proceedings in chapter 15 cases.[15]

85.     Accordingly, the English Proceeding constitutes a "foreign proceeding".

       2.     *The English Proceeding Constitutes a "Foreign Main Proceeding".*

---

[15] *See, e.g.*, *In re New World Res. N.V.*, No. 14-12226 (SMB) [Dkt. No. 20] (Bankr. S.D.N.Y. Sept. 9, 2014); *In re Towergate Fin.*, No. 15-10509 (SMB) [Dkt. No. 16] (Bankr. S.D.N.Y. Mar. 27, 2015); *In re Avanti Commc'ns Grp. plc*, No. 18-10458 (MG) [Dkt. No. 15] (Bankr. S.D.N.Y. Apr. 6, 2018); *In re New Look Secured Issuer plc*, No. 19-11005 (SMB) [Dkt. No. 14] (Bankr. S.D.N.Y. May 2, 2019); *In re NN2 Newco Ltd.*, No. 19-23277 (RDD) [Dkt. No. 10] (Bankr. S.D.N.Y. July 30, 2019); *In re: Lecta Paper UK Ltd.*, No. 19-13990 (MEW) [Dkt. No. 12] (Bankr. S.D.N.Y. Feb. 4, 2020).

86.     The English Proceeding further qualifies as a "foreign main proceeding". The Bankruptcy Code defines a "foreign main proceeding" as "a foreign proceeding pending in the country where the debtor has the center of its main interests [("**COMI**")]". 11 U.S.C. § 1502(4).    While the Bankruptcy Code does not expressly define COMI, it presumes that a debtor's "registered office" is its COMI "[i]n the absence of evidence to the contrary".    *See* 11 U.S.C. § 1516(c).

87.     Courts have also identified factors that may be relevant in identifying a debtor's COMI, which include "the location of the debtor's headquarters; the location of those who actually manage the debtor (which, conceivably, could be the headquarters of a holding company); the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes." *In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006), *aff'd*, 371 B.R. 10 (S.D.N.Y. 2007).    Under Second Circuit law, the relevant point in time in determining the location of a debtor's COMI is the date on which the chapter 15 petition was filed.    *See In re Fairfield Sentry Ltd.*, 714 F.3d 127, 135 (2d Cir. 2013).

88.     Here, the Debtor's COMI is in London, England.

89.     *First*, the Debtor was incorporated under the laws of England and Wales as a private limited company on July 9, 2020, with its registered office in England, specifically at 1 Chamberlain Square Cs, Birmingham, United Kingdom, B3 3AX.    Foreign Rep. Decl. ¶ 7.

90.     *Second*, the financing arrangement that is at the heart of the Scheme—the Existing SSNs (and the guarantees thereunder)—is governed by, and interpreted in

accordance with, English law.  Foreign Rep. Decl. ¶ 16.  Further, the relevant trust deed

provides that disputes related to the Existing SSNs are subject to the non-exclusive

jurisdiction of the courts of England and Wales.  Foreign Rep. Decl. ¶ 61.

91.     *Third*, the Existing Intercreditor Agreement, which, among other things,

governs the relative priority and security enforcements rights of the Debtor's Existing

Principal Financing Arrangements, is governed by English law.  Foreign Rep. Decl. ¶ 23.

92.     Accordingly, England is the Debtor's COMI and the English Proceeding is

a "foreign main proceeding" under section 1517(b) of the Bankruptcy Code.

    **B.      The Foreign Representative Satisfies the Requirements of a "Foreign
Representative" under Section 101(24) of the Bankruptcy Code.**

93.     The second requirement for recognition of a foreign proceeding under

section 1517(a) of the Bankruptcy Code is that the foreign representative applying for

recognition be a "person or body".  11 U.S.C. § 1517(a)(2).

94.     The Petitioner is a "foreign representative" as defined under section 101(24)

of the Bankruptcy Code.   Section 101(24) of the Bankruptcy Code defines "foreign

representative" as a "person or body, including a person or body appointed on an interim

basis, authorized in a foreign proceeding to administer the reorganization or the liquidation

of the debtor's assets or affairs or to act as a representative of such foreign proceeding."

11 U.S.C. § 101(24).   Under section 101(41), the term "person" includes an individual.

11 U.S.C. § 101(41).

95.     The Petitioner, Joost Johannes Hendrikus De Beijer, is an individual who

has been (1) appointed by the Debtor's board as foreign representative of the English

Proceeding and (2) declared as authorized to act as the Debtor's "foreign representative"

pursuant to the Convening Court Order.  *See* Foreign Rep. Decl. ¶ 3, 69.

**C.      The Petition Was Properly Filed and Meets the Requirements of Section 1515.**

96.     The third and final requirement for chapter 15 recognition under section 1517(a) of the Bankruptcy Code is that the petition meets the procedural requirements of section 1515 of the Bankruptcy Code.  *See* 11 U.S.C. § 1517(a)(3).  Here, all the section 1515 requirements have been met.

97.     *First*, in accordance with section 1515(a), the Petitioner duly and properly commenced this Chapter 15 Case in accordance with sections 1504 and 1509 of the Bankruptcy Code, which require the filing of a petition directly with the court for recognition under section 1515.  *See* 11 U.S.C. §§ 1515(a), 1504, 1509(a).

98.     *Second*, in accordance with sections 1515(b)(1) and 1515(b)(2), the Petitioner attached to the Form of Voluntary Petition a certified copy of the Convening Order commencing the English Proceeding and noting the appointments of Joost Johannes Hendrikus De Beijer as foreign representative with respect thereto.

99.     *Third*, in accordance with section 1515(c), the Petitioner submitted a declaration containing a statement identifying the English Proceeding as the only known pending "foreign proceeding" with respect to the Debtor.  *See* Foreign Rep. Decl. ¶ 81.

100.     *Lastly*, all of the documents required pursuant to section 1515(b)(1) and 1515(b)(2) with respect to the English Proceeding are in the English language; thus, no translation of the respective documents is necessary as otherwise required under section 1515(d).

101.     Accordingly, each of the requirements of section 1517(a) have been satisfied, and entry of an order recognizing the English Proceeding as a foreign main proceeding is proper.

III.    **THE DEBTOR IS ENTITLED TO AUTOMATIC RELIEF UNDER SECTION 1520 OF THE BANKRUPTCY CODE.**

102.    Section 1520 of the Bankruptcy Code sets forth statutory protections that automatically result from the recognition of a foreign proceeding as a foreign main proceeding. *See* 11 U.S.C. § 1520(a). This includes the application of the automatic stay under section 362(a) of the Bankruptcy Code to the Debtor and the Debtor's property within the territorial jurisdiction of the United States. Such relief is automatic and no further showing or action is required on behalf of the Debtor.

IV.    **THE COURT SHOULD GRANT ADDITIONAL DISCRETIONARY RELIEF UPON RECOGNITION PURSUANT TO SECTIONS 1507 AND 1521.**

103.    The Petitioner submits that, upon recognition, any relief that is necessary to give full force and effect within the territorial jurisdiction of the United States to the English Proceeding and the Scheme (that does not otherwise flow automatically from section 1520), including the enforcement of the Releases as well as the Injunction, is authorized under sections 1507 and 1521 of the Bankruptcy Code.

104.    Upon recognition of a foreign proceeding, section 1521(a) of the Bankruptcy Code authorizes the Court to grant, at the request of the foreign representative, any appropriate relief "where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors". 11 U.S.C. § 1521(a). To exercise its authority under section 1521(a), the Court must determine that "the interests of the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a). Such relief may include, but is not limited to:

> (1) "staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or

> liabilities to the extent they have not been stayed under section
> 1520(a)";
>
> (2) "staying execution against the debtor's assets to the extent it has not
> been stayed under section 1520(a)"; and
>
> (7) "granting any additional relief that may be available to a trustee,
> except for relief available under sections 522, 544, 545, 547, 548, 550,
> and 724(a)".

*See* 11 U.S.C. § 1521(a).

105.   Discretionary relief is also permissible under section 1507 of the
Bankruptcy Code, which provides that the Court is authorized to grant "additional
assistance" to a foreign representative provided that such assistance is "consistent with the
principles of comity". 11 U.S.C. § 1507.

106.   Courts are guided by principles of comity and cooperation with foreign
courts when deciding whether to grant additional relief under chapter 15. *See In re Bear
Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 333
(S.D.N.Y. 2008) ("[R]elief is largely discretionary and turns on subjective factors that
embody principles of comity."). Courts generally will extend comity "whenever the
foreign court had proper jurisdiction and enforcement does not prejudice the rights of
United States citizens or violate domestic public policy." *Victrix S.S. Co., S.A. v. Salen
Dry Cargo A.B.*, 825 F.2d 709, 713 (2d Cir. 1987); *see also In re Atlas Shipping A/S*, 404
B.R. 726, 733 (Bankr. S.D.N.Y. 2009).

107.   Particularly in the bankruptcy context, "American courts have long
recognized [the] need to extend comity to foreign bankruptcy proceedings because the
equitable and orderly distribution of debtor's property requires assembling all claims
against the limited assets in [a] single proceeding [and] if all creditors could not be bound,
a plan of reorganization would fail". *Id.* Furthermore, courts have found that enforcing a

39

foreign court's order is consistent with principles of comity under section 1507 when an issue "ha[s] been fully and fairly litigated" in the courts of the respective jurisdictions, regardless of whether the same result would not be reached in a plenary chapter 11 case before the same court. *See In re Sino-Forest Corp.*, 501 B.R. 655, 663 (Bankr. S.D.N.Y. 2013); *In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. 685, 698 (Bankr. S.D.N.Y. 2010).

108.    Here, all Scheme Creditors have been provided with ample notice and adequate disclosure of the Scheme terms.  Specifically, on July 15, 2020, the Information Agent sent the PSL to the Scheme Creditors via email (where the details of the relevant Scheme Creditors were known to the Information Agent), via the Clearing Systems and through the Scheme Website, which included information pertaining to the date and format (*i.e.*, virtual) of the Convening Hearing.  *See* Foreign Rep. Decl. at ¶ 67.  On July 27, 2020, the Debtor filed an application under part 26 of the Companies Act requesting that the High Court convene the Scheme Meeting.  *Id.* ¶ 68.

109.    On July 29, the High Court held the Convening Hearing to consider the Debtor's request for an order convening the Scheme Meeting.  Foreign Rep. Decl. at ¶ 69. The High Court found, among other things, that:  (1) its jurisdiction was proper on the basis that the Scheme Company was incorporated in England and because the Existing SSNs Trust Deed that governs the Existing SSNs is governed by English law; (2) a single class of Scheme Creditors was warranted because the rights of the Scheme Creditors, *i.e.*, the beneficial owners of the Existing SSNs, are substantially the same and will be compromised pursuant to the Scheme in substantially the same way; and (3) adequate notice of the Convening Hearing had been provided to the Scheme Creditors.  *See* UK Law Decl. ¶ 30.  Pursuant to these findings, the High Court granted the Debtor's application to

40

convene a Scheme Meeting on August 19, 2020. *Id.* ¶ 31. Shortly thereafter, the Information Agent published the Scheme and related documents on the Scheme Website. Foreign Rep. Decl. at ¶ 70. The published information included copies of the Scheme, notices of the Scheme Meeting and the Explanatory Statement. *Id.*

110. On August 19, 2020, the Debtor convened the Scheme Meeting. The Scheme was approved by the requisite majority in number of the voting Scheme Creditors representing at least 75% in value of each class of Scheme Creditors. Foreign Rep. Decl. ¶ 71, *see also* UK Law Decl. ¶ 18. Having received the necessary votes in favor of the Scheme, the High Court will conduct the Sanction Hearing which is currently scheduled for August 24, 2020. Foreign Rep. Decl. ¶ 71. All creditors will have a full and fair opportunity to object and/or otherwise be heard in the English Proceeding before an impartial court in accordance with fundamental standards of due process. *See* UK Law Decl. ¶ 20.

111. Based on these considerations, principles of comity support the full spectrum of the Relief Requested, including the enforcement of the Releases as well as the Injunction, that is necessary to give full force and effect to the Scheme within the territorial jurisdiction of the United States.

### A.     The Releases Are Necessary, Appropriate and Should Be Enforced.

112. In evaluating third-party releases, a court will analyze whether the foreign proceeding provided "a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other

41

countries", and whether there was anything to show "either prejudice in the court, or in the system of laws under which it is sitting". *In re Metcalfe*, at 698.

113.    Furthermore, "when the foreign proceeding is in a sister common law jurisdiction with procedures akin to our own, comity should be extended with less hesitation, there being fewer concerns over the procedural safeguards employed in those foreign proceedings." *Id*.  England, a sister common law jurisdiction, shares similar common law traditions and fundamental principles of law as the United States (indeed, the roots of American common law derive from English traditions).  Relatedly, courts in this District have enforced third-party releases contained in UK schemes of arrangement under section 1507 of the Bankruptcy Code.[16]

114.    Failure to enforce the Releases would materially prejudice all creditors because certain Scheme Creditors or other parties could seek to obtain greater recoveries in the United States against the Debtor (or the Debtor's related or affiliated persons or entities) than what they would be entitled to under the Scheme.  Additionally, if Scheme Creditors commenced actions in the United States related to the Releases, the Debtor would need to expend significant time and incur significant expense defending any such proceeding which would deplete the resources of the restructured business and jeopardize the Debtor's reorganized value.

---

[16] *See, e.g.*, *In re New World Res. N.V.*, No. 14-12225 (SMB) (Bankr. S.D.N.Y. Mar. 27, 2015); *In re Towergate Fin. PLC*, Case No. 15-10509-SMB [Dkt. No. 16] (Bankr. S.D.N.Y. Mar. 27, 2015) (holding that the UK scheme was entitled to "full force and effect, including the scheme releases set forth therein"); *In re Magyar Telecom B.V.*, Case No. 13-13508-SHL [Dkt. No. 26] (Bankr. S.D.N.Y. Dec. 11, 2013).

B.     **Granting a Permanent Injunction Is Necessary To Enforce the Scheme and the Sanction Order.**

115.   To the extent not otherwise stayed under sections 1520 and 362 of the Bankruptcy Code, the Petitioner also requests that the Court grant the Injunction pursuant to its discretionary powers under section 1521.

116.   Section 1521(e) provides that "[t]he standards, procedures, and limitations applicable to an injunction shall apply to relief sought under section 1521(a) of the Bankruptcy Code". 11 U.S.C. § 1521(e).  Injunctive relief is appropriate where the movant can show a likelihood of irreparable harm.  *See Clarkson v. Coughlin*, 898 F. Supp. 1019, 1035 (S.D.N.Y. 1995).  In the bankruptcy context, irreparable harm exists where the "equitable and orderly distribution of a debtor's property" are disrupted.  *In re Vitrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713-714 (2d Cir. 1987).

117.   Courts in this District have repeatedly recognized their authority to grant injunctive relief to enforce foreign plans and discharges.  *See, e.g.*, *In re CGG S.A.*, 579 B.R. 716, 720 (Bankr. S.D.N.Y. 2017) (granting permanent injunctive relief in respect of a French plan in order to "prevent any parties from gaining an unfair advantage over other parties in interest subject to the [foreign plan]"); *In re Garcia Avila*, 296 B.R. 95, 114 (Bankr. S.D.N.Y. 2003) ("[I]rreparable harm is present when the failure to enjoin local actions will disrupt the orderly reconciliation of claims and fair distribution of assets in a single, centralized forum").

118.   The risk of irreparable harm exists here because dissenting creditors who are bound to the terms of the Scheme pursuant to the Sanction Order may attempt to collaterally attack the Scheme in the U.S. forum.  If Scheme Creditors could effectively circumvent the terms of the Scheme by commencing actions in the United States, the

43

purpose of the Scheme could be undermined, leaving the Debtor to defend against these lawsuits, however meritless, which would result in a waste of the Debtor's time and resources.

119.    Accordingly, the Injunction is warranted to ensure the fair and efficient implementation of the Scheme and to bind all of the Debtor's creditors to the terms of the Scheme, as approved by the Sanction Order.

## V.    GRANTING THE RELIEF REQUESTED WOULD NOT BE MANIFESTLY CONTRARY TO THE UNITED STATES PUBLIC POLICY.

120.    Section 1506 of the Bankruptcy Code, referred to as the "public policy exception", provides that "[n]othing in [chapter 15] prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States."   11 U.S.C. § 1506.   Congress intended the public policy exception to be narrowly construed.  *See* H. Rep. No. 109-31, pt. 1, at 109 (2005) ("[The publicly policy exception] provision . . . has been narrowly interpreted on a consistent basis in courts around the world.  The word 'manifestly' in international usage restricts the public policy exception to the most fundamental policies of the United States.").

121.    Nothing in the Scheme or the Proposed Order (including the Releases) is contrary to U.S. public policy, much less "manifestly" contrary.  The Scheme provides for a comprehensive resolution of the Debtor's obligations under the Existing SSNs, and the Amended SSNs, the New Holdco PIK Notes, New Holdco Shares and New PPNs will be distributed in proportion to the amount of the Existing SSNs, a result which is substantially similar to one that would be achieved through a chapter 11 plan of reorganization. Relatedly, much of the Relief Requested would also be available under a chapter 11 plan

44

of reorganization.  With respect to the Releases, U.S. bankruptcy courts have repeatedly held that such releases are not manifestly contrary to U.S. public policy.  *See, e.g., In re Avanti*, at 618 ("[S]chemes of arrangements sanctioned under UK law that provide third-party non-debtor guarantor releases should be recognized and enforced under chapter 15 of the Bankruptcy Code.").

122.    Accordingly, the public policy exception does not apply.  The Scheme and the Proposed Order, including the Releases, comport with the Bankruptcy Code and are consistent with U.S. public policy.

## VI.    THE FOREIGN REPRESENTATIVE IS NOT SUBJECT TO THE JURISDICTION OF ANY COURT IN THE UNITED STATES BY VIRTUE OF HIS ROLE IN THE CHAPTER 15 CASE.

123.    Under 11 U.S.C. § 1510, the sole fact that a foreign representative files a petition for recognition of a foreign proceeding under chapter 15 of the U.S. Bankruptcy Code does not subject the foreign representative to the jurisdiction of any court in the United States for any other purpose.  Further, courts in this District have held that no actions taken by a foreign representative in furtherance of a scheme or related chapter 15 proceedings shall constitute a waiver of jurisdictional immunity under section 1510.  *See In re Servicos de Petroleo Constellation S.A.*, 613 B.R. 564, 569 (Bankr. S.D.N.Y. 2020). Accordingly, (i) no action taken by the Petitioner in preparing, disseminating, applying for, implementing or otherwise in connection with the Scheme, (ii) any order entered in respect of this Petition or the Chapter 15 Case, or any further order for additional relief in the Chapter 15 Case and (iii) any adversary proceeding or contested matters in connection with the Chapter 15 Case, should be deemed to constitute a waiver of any immunity afforded by the Petitioner as Foreign Representative pursuant to section 1510 of the Bankruptcy Code.

45

## VII. WAIVER OF ANY APPLICABLE STAY OF EFFECTIVENESS IS APPROPRIATE TO ENSURE TIMELY IMPLEMENTATION OF THE PROPOSED RESTRUCTURING.

124.    The Petitioner respectfully requests that the Court cause the order, once granted, to become effective immediately upon entry, notwithstanding any provision in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") that might otherwise contemplate a stay of effectiveness, including, but not limited to, Bankruptcy Rules 1018 and 7062.  Such a waiver is appropriate in these circumstances to allow the Debtor to proceed on a timely basis with the implementation of its Proposed Restructuring.  The timetable for completion of the Proposed Restructuring is protracted— once the Scheme is sanctioned and the English Proceeding is recognized by this Court under chapter 15 of the Bankruptcy Code, the Debtor will need to petition the Dutch Court for approval to approve the proposed enforcement over the Share Pledges, a process that is expected to take several weeks.  Foreign Rep. Decl. at ¶ 77.  In light of the already negative effects Covid-19 has had on the business, extending an already drawn-out restructuring process, even by two weeks, may negatively impact the market's confidence (among the Group's customers, suppliers and credit insurers) in the Group's ability to continue as a going concern, which will inevitably affect the viability of the Group's business.  *Id.*

125.    Additionally, a key requirement of the Proposed Restructuring is the need to address concerns around the Group's liquidity position (caused in part by suppliers and credit insurers imposing more stringent payment terms as a way of reducing their exposure to the Group).  Foreign Rep. Decl. at ¶ 78.  To that end, the Proposed Restructuring provides for the issuance of the New PPNs, which will help to increase the Group's liquidity buffer to a more manageable level.  *Id.*  It is the Directors' view that any delay in

the implementation of the Proposed Restructuring could result in a further deterioration of the Group's liquidity position (in particular, given the adverse impact of a delay on the behavior of suppliers and credit insurers), and could call into question whether the liquidity buffer provided by the New PPNs is adequate. *Id.* This also assumes that there is no "second wave" of Covid-19 to further damage the business before the Proposed Restructuring is implemented. *Id.*

126.    Courts in this District routinely provide full or partial waivers of the stay of effectiveness period in chapter 15 cases. *See, e.g.*, *In re NN2*, No. 19-23277 (RDD) [Dkt. No. 10] (Bankr. S.D.N.Y. July 30, 2019); *In re Lecta*, No. 19-13990 (MEW) [Dkt. No. 12] (Bankr. S.D.N.Y. Feb. 4, 2020); *In re Avanti*, No. 18-10458 (MG) [Dkt. No. 15] (Bankr. S.D.N.Y. May 2, 2019); *In re CGG*, No. 17-11636 (MG) [Dkt. No. 25] (Bankr. S.D.N.Y. Dec. 21, 2017).

127.    For these reasons and in light of the high degree of support for the Scheme amongst the Scheme Creditors (as evidenced by the high participation rate in the Lock-up Agreement, *see supra* ¶ 52), granting a waiver of a stay of effectiveness is appropriate so that the Proposed Restructuring can be implemented as soon as possible.

## **NOTICE**

Notice of this Petition has been provided to:  (i) the United States Trustee for the Southern District of New York; (ii) the SSN Trustee; (iii) the Common Depositary Nominee; (iv) the Scheme Creditors; (v) the Information Agent; (vi) counsel to the Ad Hoc Group; and (vii) all parties required to be given notice under Bankruptcy Rule 2002(q)(1) of which the Petitioner is aware.  Furthermore, notice of the intention to commence this

case was given to the Scheme Creditors in the PSL and the Explanatory Statement, and a link to this Petition has been added to the Scheme Website.

## **NO PRIOR REQUEST**

128.   No previous request for the relief requested herein has been made to this or any other court.


WHEREFORE, the Foreign Representative respectfully requests entry of an order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other and further relief as is just and proper.

Dated:  August 19, 2020

Respectfully submitted,

CRAVATH, SWAINE & MOORE LLP

by

/s/ *Paul H. Zumbro*

Paul H. Zumbro
Lauren A. Moskowitz
825 Eighth Avenue
New York, NY  10019-7475
(212) 474-1000
pzumbro@cravath.com
lmoskowitz@cravath.com

*Attorneys for the Foreign Representative*